Michael D. Collins (State Bar No. 166319)
  michael.collins@fordlawfirm.com
William H. Ford, III (State Bar No. 52382)
  william.ford@fordlawfirm.com
**COLLINS | FORD, LLP**
21900 Burbank Blvd., Third Floor
Woodland Hills, CA 91367
Telephone: (818) 343-2648
Attorneys for Plaintiffs Uber Technologies, Inc., and Raiser, LLC

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UBER TECHNOLOGIES, INC., a Delaware corporation; RAISER, LLC, a Delaware limited liability company,<br><br>        Plaintiffs,<br><br>    v.<br><br>CERTAIN UNDERWRITERS AT LLOYDS, LONDON SUBSCRIBING TO POLICY NO. B0146CYUSA 1400432, doing business as "Principia Underwriters"; CERTAIN UNDERWRITERS AT LLOYDS, LONDON SUBSCRIBING TO POLICY NO. B0146CYUSA1400588, doing business as "Aspen Insurance"; and DOES 1 through 25,<br><br>        Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT** |

## NATURE OF THE ACTION

1.      This insurance coverage dispute follows settlement of consolidated nationwide class actions: *Philliben et al.* v. *Uber Technologies, Inc. et al.,* Case No.

3:14-cv-05615-JST (N.D.Cal.) ("*Philliben*") and *Mena et al.* v. *Uber Technologies, Inc.,* Case No. 3:15-cv-00064-JST (N.D. Cal.) ("*Mena*"), the Honorable Jon S. Tigar presiding. The *Philliben* and *Mena* actions were later consolidated for all purposes on January 4, 2016 (hereafter referred to as "*McKnight*"). See N.D.Cal. Case No. 3:14-cv-05615-JST (ECF 66).

2. The *McKnight* actions involved direct allegations by users arising from Uber's "Safe Rides Fee", safety measures, and the nature of Uber's background checks (as alleged in more detail below).

3. Uber's primary professional liability insurer, defendant Principia, provided Uber with a defense under certain reservations of rights.

4. Following Uber's filing of a motion to compel arbitration and to stay the *McKnight* actions, the *McKnight* parties participated in an initial mediation. At that mediation, Principia and Aspen agreed to tender their combined limits of $30 Million toward funding a settlement of *McKnight*, subject to certain reservations of rights which included the right to seek reimbursement of settlement and defense costs.

5. After protracted negotiations and a tortuous procedural history, *McKnight* ended in a $32.5 Million settlement jointly funded by Uber, Principia and Aspen with the latter two exhausting their policy limits of $20 Million and $10 Million, respectively.

## THE PARTIES

6. Plaintiffs are Uber Technologies, Inc., a Delaware corporation and Raiser, LLC, a Delaware limited liability company (collectively "Uber").

7. Defendant Certain Underwriters At Lloyds, London Subscribing To Policy No. B0146CYUSA 1400432 is a consortium of underwriters based in London, England and doing business in California as "Principia Underwriters" (hereinafter "Principia").

8. Defendant Certain Underwriters At Lloyds, London Subscribing To Policy No. B0146CYUSA1400588 is a consortium of underwriters based in London, England and doing business in California as "Aspen Insurance" (hereinafter "Aspen").

9. Lloyd's of London is comprised of various syndicate and company underwriters who share liability as subscribers to insurance policies issued out of the London market. These policies typically have multiple subscribers that collectively are responsible for 100% liability.

10. Hereinafter Principia and Aspen are collectedly referred to as "Underwriters" or the "Insurers."

11. On information and belief, at all times relevant to this Complaint, each Defendant was authorized to transact and transacted business of insurance in the State of California, as a "non-admitted" or "surplus lines" insurer.

12. On information and belief, all of the members of each Defendant are United Kingdom residents or United Kingdom companies, with principal places of business in the United Kingdom.

13. The true names and capacities of Defendants Does 1 through 25, inclusive, are unknown to Plaintiffs who therefore sue such Defendants by such fictitious names. Plaintiffs will amend this complaint to show the true names and capacities of such Defendants when the same have been ascertained. Plaintiffs are informed, believe and thereon allege that each of the fictitiously named Defendants acted or omitted to act as alleged in this complaint, or conspired with, participated with, aided and abetted, or ratified the acts and omissions of the other Defendants as alleged in this complaint.

///
///
///
///

14. Plaintiffs are informed and believe and thereon allege that each of the Defendants was the agent, servant, employee, partner, co-venturer, attorney, assignee, or delegatee with each of the remaining Defendants and their acts or omissions to act as alleged herein was within the course and scope of that agency, or delegation.

**JURISDICTION AND VENUE**

15. This Court has jurisdiction over the subject matter of this declaratory judgment action pursuant to 28 U.S.C. §§ 1332(a)(1), 2201(a) and 2202. Plaintiffs and Defendants are diverse in citizenship and the amount in controversy exceeds $75,000.

16. Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §2201 permit Uber to seek a declaration from this Court as to the rights and obligations among and between the parties in relation to the insurance policies issued by the Underwriters.

17. Venue is proper because this dispute arises out of events that occurred in San Francisco County and because the underlying lawsuits were filed in the United States District Court for the Northern District of California.

18. Defendants sold insurance policies in California.

19. In those insurance policies, defendants consented to submit to the jurisdiction of a court of competent jurisdiction within the United States. Disputes under the insurance policies will be governed by California law.

**FACTUAL ALLEGATIONS**

A. **Background Facts of Underlying Class Actions**

20. The operative complaint in the *McKnight* action, the Consolidated Class Action Complaint ("CCAC"), alleged that Uber offered a variety of rideshare options that were differentiated by the size and type of the vehicle and /or the

number of riders. See *McKnight*, N.D.Cal. Case No. 3:14-cv-05615-JST, ECF 67, at ¶¶ 3-7.

21. The options were or have been referred to as UberPool, UberX, UberXL, UberSelect, UberBlack, UberSUV, *etc.* Uber charged different fares depending on the type of option a consumer ordered. For these options, Uber represented that its drivers were "thoroughly screened through a rigorous process it developed using industry leading standards."

22. Any person with a qualifying vehicle could apply and become a driver to provide transportation under a number of these options.

23. When creating an account with Uber, consumers placed a credit or debit card or PayPal account on file with Uber to eliminate the need for cash payments. When a consumer ordered and/or completed a ride, Uber, as the limited payment collections agent on behalf of the driver, facilitated the processing of the payment from that consumer, retained a portion for itself and remitted the balance to the driver.

24. In 2014, Uber began charging a "Safe Rides Fee" ("SRF") for rides in the United States. The SRF was a separate line item on the receipt following a ride. The purpose of this charge was to offset various safety-related expenditures including, for example, vehicle inspections, insurance for the benefit of riders, safety personnel, and innovative features such as cashless transactions and real-time GPS tracking of rides. The total amount charged as the "SRF" allegedly fell short of the amount Uber spent towards the improvement of rider safety.

### B.   Summary of Class Action Allegations

25. The operative complaint, the *McKnight* CCAC, alleged that the SRF was "ostensibly" used to support Uber's representations that it had "an industry leading background check process," regular motor vehicle checks, and driver safety education. See *McKnight*, *supra,* ECF 67 at ¶¶ 5-6. However, the *McKnight* CAAC

alleged Uber's background checks and other safety measures were "woefully inadequate and fell well short" of what was required of "common carriers." *Ibid*. It alleged drivers on the Uber App did not have to undergo criminal background checks or fingerprint identification. *Ibid*. It alleged Uber did not provide for "regular motor vehicle checks" and the SRF was not used to provide sufficient "driver safety education." *Id.* at ¶¶ 9 and 10.

26. The *McKnight* CAAC further alleged that the SRFs collected exceeded the money Uber paid to provide the "safest possible platform" and "as a consequence, by assessing and charging consumers the Safe Rides Fee," the *McKnight* plaintiffs had been and would continue to be, damaged. *Id.* at ¶ 12 and 13.

27. The CAAC alleged Uber's conduct constituted a breach of implied contract and a violation of the unfair competition statutes in three states, California, Illinois and Massachusetts, and sought damages, restitution and injunctive relief. *Id.* at ¶19.

    **C.**    **Summary of Uber's Defenses to the *McKnight* CAAC**

28. Uber filed a motion to stay the class actions and compel arbitration based on an arbitration provision in Uber's Terms and Conditions that a rider signs to use the Uber platform. Uber mounted a further procedural defense to class certification.

29. Uber also raised merits-based defenses arguing that many of the statements featured in the CCAC were used only for a limited period of time, and others were likely not actionable as a matter of law (*e.g.*, "safest ride on the road" and "safest possible platform").

///
///
///
///
///
///
///

30. Uber also argued that plaintiffs had understated the amount Uber spent on relevant safety expenditures. In particular, Uber argued that plaintiffs failed to fully consider Uber's insurance costs and costs that related to core components of the Uber platform that are important to safety (*e.g.,* cashless payments; GPS tracking). Uber contended that if plaintiffs were to include these costs, then Uber's safety costs would exceed the revenue collected from the SRF.

### D. Summary of McKnight Settlement

31. In August 2016, the *McKnight* plaintiffs' first attempt to obtain an order approving of a settlement was rejected by Judge Tigar. Judge Tigar denied their motion identifying three deficiencies: (1) the settlement provided preferential treatment to certain class members; (2) the $28.5 million settlement amount did not fall within the range of possible approval; and (3) the class did not satisfy F.R.Civ.R. 23's typicality, commonality, and predominance requirements.

32. Plaintiffs and Uber went back to mediation this time before Chief Magistrate Judge Joseph C. Spero. See, "Order Granting Motion for Preliminary Approval of Amended Class Action Settlement," *McKnight* ECF 136. The mediation resulted in a settlement agreement that cured the deficiencies of the first motion.

33. First, the settlement amount increased to $32.5 million, which was based roughly on the *McKnight* plaintiffs' alleged damages.

34. Second, the settlement also provided for injunctive relief in which Uber agreed to cease charging a "Safe Rides Fee" and to refrain from using statements like "safest ride on the road" when describing their safety measures in commercial advertising. *McKnight,* ECF 136, at p. 3; and ECF 125, at p. 16.

35. Due to extensive post settlement litigation following the *McKnight* settlement, the settlement itself was not finally funded until on or about April 24, 2023.

**E.  Summary of Principia's Policy**

36. The Principia policy, "Technology, Media and Cyber Liability Insurance Policy" was Uber's primary professional liability policy (e.g., primary errors and omissions) issued on a claims made and reported basis for the period October 5, 2014 to October 5, 2015[1]. The Policy had a Retroactive Date of September 5, 2012.

37. The Principia Policy provided limits of $20,000,000 in the aggregate for the Policy Period for all Claims, costs and expenses. The limit of liability was subject to a $250,000 Retention for each and every Claim; however, Claims, Damages and Costs in connection with class action lawsuits were subject to a $500,000 Retention for each and every Claim. As *McKnight* involved class action allegations, the Retention was $500,000.

38. Under Insuring Agreement *A. Technology Solutions Liability*, Principia agreed to pay any **Damages** including **Costs** which Uber became legally required to pay as a result of a Claim brought by a Third Party due to an actual or alleged Technology Wrongful Act arising from its provision of Technology Solutions.

39. Under Insuring Agreement *B. Media and Intellectual Property Liability*, Principia agreed to pay any **Damages** including **Costs** which Uber became legally required to pay as a result of a **Claim** due to an actual or alleged **Media or Intellectual Property Wrongful Act** arising from Uber's **Media Activities**.

40. The Policy contains the following relevant definitions:

> **Claim** means: i. A written demand for monetary damages, non-monetary relief or injunctive relief; or ii. A civil proceeding

---

[1] The Principia policy and its terms are incorporated by reference into the allegations of this Complaint. A copy has not been attached due to volume and because the document contains certain proprietary and otherwise commercially sensitive information. Each party to this action has a complete copy of the Principia policy and a copy can be provided to the Court upon request.

against any Insured, seeking monetary damages or nonmonetary or injunctive relief, commenced by the service of a complaint or similar proceeding; or iii. Written demand that the Insured toll or waive a statute of limitations; or iv. **Cyber Extortion Demand**; or v. * * *;  or vii. An arbitration commenced by receipt of a written request, demand or invitation to arbitrate, or similar communication; or viii. An invitation to enter into alternative dispute resolution, including, where applicable, any appeal therefrom; ix. * * *; or x. Any decision or order of the Federal Trade Commission or any other regulatory body with responsibility for **Your** industry in connection with **Your Media Activities**.

**C-Suite** means current persons holding any of the following positions: **Named Insured's** Chief Technology Officer, Chief Operating Officer, Chief Financial Officer, Chief Executive Officer, Chief Risk Officer or Chief Information Officer of functional equivalents.

**Damages** means monetary judgments, statutory damages, consumer redress fund, award, settlement, or punitive, exemplary damages where insurable by law and subject to the venue most favourable to You.

**Damages** also includes: i. Fines, penalties pursuant to coverage available under **Claim** sub-section v or xi, where insurable by law. The insurability of such fines and penalties will be determined by the venue most favourable to **You.** * * *; ii.

Amounts payable pursuant to coverage available under Claim sub-section vi.

**Media Activities** means the provision of spoken or written work, imagery and communication by or on behalf of **You** in the ordinary course of **Your Business** (including public engagements), . . . .

**Media and Intellectual Property Wrongful Act** means: 1. Misstatement, misrepresentation or the misuse of information; or ii. * * * or iii. An infringement of any form of intellectual property (except patents) and any unfair competition or misleading business practices thereon; or iv. * * * ; or v. Any unintentional misrepresentative advertising or the breach of any advertising regulation or statute; or * * *

**Technology Solutions** means the services performed for others by or on behalf of **You** in the ordinary course of **Your** business activities, and also means the provision of any computer and telecommunications products in the ordinary course of **Your Business** including hardware or software developed, created, manufactured, sold, leased, licensed, handled, distributed, installed, repaired, serviced, updated, developed or disposed of by **You,** or by others trading under **Your** name, including: i. Containers, packaging, labeling, instructions, materials, components, parts or equipment furnished in connection with such goods or products; and ii. Warranties or representation made at any time with respect to the fitness, quality, durability,

performance or use of the goods or products; and the providing of or failure to provide warnings or instructions.

**Technology Wrongful Act** means: i. **Bodily Injury,** but only in the provision of **Technology Solutions;** or ii. * * * iii.  Any negligent act, error, omission, or negligent misstatement; or iv. A breach of a written, verbal, express or implied contract resulting from the failure of **Technology Solutions** to meet the agreed specifications, delivery timescale and/or the failure to use reasonable skill and care; or iv. * * *;

**12. Notification of a Claim**: a) it is a condition precedent to cover under this Policy that You shall notify Insurers in writing as soon as practicable but no later than 90 days after the C-Suite discovers or is first made aware of a Claim during the Policy period (or Extended Reporting Period if applicable), or within 60 days after the Policy Period.

41. The Principia Policy also includes the following relevant exclusions:
2.    Arising out of any circumstance(s) which could give rise to a **Claim** under this Policy of which **Your C-Suite** was aware prior to the earlier of the Inception Date of this Policy as shown in the Declarations Page or the first inception date of the policy which this Policy is a renewal of.

3.    Arising out of any deliberate, dishonest, fraudulent or criminal acts by **You** acting with the knowledge or consent on **Your C-Suite,** however this exclusion shall not apply to

      **Costs** incurred in defending any such Claim or loss alleging the foregoing until there is a final adjudication establishing such conduct in the underlying proceeding, at which time **You** shall reimburse Insurers for all such **Costs** incurred.

    4.    For or arising out of any actual antitrust violation, restraint of trade, unfair competition, false, deceptive or unfair trade practices, violation of consumer protection laws or false or deceptive advertising, notwithstanding any coverage available under Section I.B (Media or Intellectual Property Liability) or I.C.1. (Breach of Network Security & Privacy Liability).

### F. Summary of Aspen's Excess Policy

42. The Aspen excess policy, styled "WNM Professional Indemnity (Excess: Aggregate Costs Inclusive)", was issued for the October 5, 2014 to October 5, 2015 policy period on a follow form basis and provided $10 Million in excess to Principia's $20 Million with a Retroactive date of September 5, 2012.[2]

43. As such, Aspen is subject to the terms and conditions of the Principia policy including Uber's underwriting submissions set forth *infra*.

///
///
///
///

---

[2] The Aspen policy and its terms are incorporated by reference into the allegations of this Complaint. A copy has not been attached due to volume and because the document contains certain proprietary and otherwise commercially sensitive information. Each party to this action has a complete copy of the Aspen policy and a copy can be provided to the Court upon request.

**G.     Summary of Uber's Underwriting Submission and Warranty Statement**

44.     As part of the application process for insurance, Principia required Uber to complete and sign two documents: (a) a 23 page "Underwriting Submission" and (b) a one-page Warranty Statement, which expressly incorporates by reference Uber's responses to the Underwriting Submission.

45.     The Underwriting Submission consisted of Sections 1 through 12 titled as follows: (1) "General Information"; (2) "Contracts"; (3) "Regulatory Compliance"; (4) "Information & Technology Security"; (5) "Human Resource and Internet Control"; (6) "Communication Compliance"; (7) "Media Content"; (8) "Merchandise & Advertising" (crossed-out by large red "X"); (9) "Product Endorsement" (crossed-out by large red "X"); (10) "Payment Transactions"; (11) "Third-Party Due Diligence"; (12) "Incidents or Claims History" (crossed-out by large red "X").

46.     Because "Section 12 - Claims History" was crossed-out, there were no required answers to any of the twelve separate questions contained in Section 12.

47.     The relevant portion of the Warranty Statement provided as follows:

> Statements made *solely* for the $10M xs $20M E&O Limits of Liability ("Proposed Coverage")." [¶] Is the Applicant, any of its principals, officers or directors or the individual signing this Warranty Statement aware of any fact or circumstances reasonably likely to give rise to a Claim to the Proposed Coverage arising out of the activities described in the underwriting submission previously provided?  [__] Yes  [X] No
> 
> **IT IS UNDERSTOOD AND AGREED THAT ANY CLAIM ARISING FROM ANY PRIOR OR PENDING**

**PROCEEDING, OR KNOWN FACT OR CIRCUMSTANCES, IS EXCLUDED FROM THE PROPOSED COVERAGE.**

The undersigned Officer of the Applicant declares that to the best of his or her knowledge on behalf of himself/herself, Uber Technologies, Inc., any Subsidiary thereof, and all such Insureds that the statements set forth herein are true and correct. The undersigned further agrees that if any significant adverse change in the condition of the applicant is discovered between the date of this Warranty Statement and the effective date of the Proposed Coverage, which would render this Warranty Statement inaccurate or incomplete, notice of such change, will be reported in writing to the Insurer immediately. The signing of this Warranty Statement does not bind the undersigned to purchase the insurance. [¶] With respect to any liability coverage part, it is agreed by the Company and the Applicant that the particulars and statements contained herein, are material and any Policy in force or subsequently issued is issued in reliance upon the truth of such statements; provided, however, that the knowledge of one Insured Person shall not be imputed to any other Insured Person for purposes of determining the validity of this Policy. Only the knowledge of the undersigned Officer, CEO, CFO, COO and Chairman of the Board will impute to the Named Insured. [¶] This Warranty Statement is deemed a part of any Application for insurance submitted to the Insurer.

### H. Summary of the District Attorneys' Letter

48. On September 24, 2014, the District Attorneys for the counties of Los Angeles and San Francisco advised Uber in a joint letter of their investigation into Uber's operations ("DA's letter").

49. The DA's letter identified four areas of interest:
> 1. Making representations on or through Uber's mobile app, website, public statements, customer receipts that Uber drivers pass an "industry leading" background check; [¶] 2. Failing to submit Uber's mobile app for approval by the California Department of Food and Ag, Div. of Meas. Stds. (DMS) in violation of Business & Professions Code § 12500.5; [¶] Operating at California airports in violation of the license granted by the California Public Utilities Commission; and [¶] Calculating "UberPool" fares on an individual-fare bases in violation of Public Utilities § 5401.

50. The DA's letter asked Uber to agree to a meeting to discuss resolution of these issues in a meeting with the San Francisco District Attorney's office prior to its filing an action under Business and Professions Code §§ *17200, et seq.*, and *17500, et seq.*

51. The DA's letter then made the following requests:
> 1. Remove all references to "industry leading" background checks from Uber's mobile app, website, public statements, and customer receipts; 2. Submit equipment, software, and any other information required by DMS for type approval of Uber's commercial measuring technology; 3. Stop drivers from operating at any California airport unless expressly authorized by the airport authority; and 4. Remove UberPool from the Uber platform.

52. The DA's letter did not make any reference to Uber's SRF.

# COUNT I
## DECLARATORY JUDGMENT
### DISTRICT ATTORNEYS' LETTER NOT NOTICE OF A "CLAIM"

53. Uber repeats and realleges paragraphs 1 through 52, above as though fully set forth therein.

54. The Principia primary policy's Exclusion No. 2 provides that Principia "will not make payment" on Uber's behalf arising out of any circumstance(s) which could give rise to a **Claim** under [its] Policy which [Uber's] **C-Suite** was aware prior to the earlier of the Inception Date of this Policy as shown in the Declaration Page or the first inception date of the policy of which this Policy is a renewal of."

55. The Defendant Underwriters contend the DA's letter was prior notice to Uber of the *McKnight* "**Claim**" and, as such, coverage for the *McKnight* settlement is barred under the Principia and Aspen policies.

56. Uber contends that the DA's letter was not prior notice of the *McKnight* action and does not fall within the plain meaning of "**Claim**" as defined and used in the Principia policy or Uber's Warranty Statement and Underwriting Submission or, in the alternative, a proper interpretation of the Principia policy and the related Warranty Statement and Underwriting Submission gives rises to an ambiguity as to the meaning of "**Claim**" that renders Exclusion No. 2 inapplicable to the *McKnight* action.

57. Uber further contends that because the DA's letter does not constitute notice of a "**Claim**" the Underwriters are not entitled to reimbursement of any policy benefits paid by the Underwriters in connection with the defense or settlement of the *McKnight* action.

///

58. An actual controversy exists between Uber on the one hand, and the Underwriters, on the other hand, regarding the rights and obligations under the Principia and Aspen policies insofar as Uber disputes the Underwriters' contention that they are entitled to reimbursement of the policy benefits paid on Uber's behalf rendering it necessary and proper for the Court to determine whether the DA's letter constituted prior notice of a "**Claim**" that under Exclusion 2 bars coverage, in whole or in part, for the *McKnight* action.

## COUNT II
## DECLARATORY JUDGMENT
## DAMAGES NOT RESTITUTION

59. Uber repeats and realleges paragraphs 1 through 58, above as though fully set forth therein.

60. The Defendant Underwriters contend the settlement money they paid on behalf of Uber towards settlement of the *McKnight* action constituted "restitution" of the Safe Ride Fees paid by users of Uber's ride sharing application to Uber.

61. The Underwriters further contend that under California law the "restitution" paid on Uber's behalf does not fall within the policy meaning of "**Damages**." The Underwriters further contend that the money paid to settle the *McKnight* action constitutes disgorgement of profits which are not covered under their policies as a matter of law.

62. Uber contends that settlement of the *McKnight* action constituted payment of compensatory "**Damages**" arising out of the *McKnight* action's claims of breach of implied contract.

63. An actual controversy exists between Uber on the one hand, and the Underwriters, on the other hand, regarding the rights and obligations under the Principia and Aspen policies insofar as Uber disputes the

Underwriters' contention that they are entitled to reimbursement of the settlement money because such money paid on Uber's behalf constituted "restitution."

## COUNT III
## DECLARATORY RELIEF
## NO OTHER EXCLUSIONS BAR COVERAGE

64. Uber repeats and realleges paragraphs 1 through 63, above as though fully set forth therein.

65. Defendant Underwriters contend that one or more policy exclusions preclude coverage for the *McKnight* action entitling Defendants to reimbursement of policy benefits paid on Uber's behalf toward settlement of the *McKnight* action.

66. Defendant Underwriters contend the policy exclusions set forth in Paragraph 36, *supra,* bar coverage in whole or in part for the *McKnight* action, entitling Defendants to reimbursement of policy benefits paid on Uber's behalf toward settlement of the *McKnight* action.

67. Defendant Underwriters further contend that *California Insurance Code* § 533, acts as a "statutory exclusion" which precludes coverage for a loss caused by the willful act of the insured bars coverage for the *McKnight* action.

68. Uber contends that neither the policy Exclusions nor *California Insurance Code* § 533 are applicable nor do they provide any basis for the Underwriters' contention that they are entitled to reimbursement of policy benefits paid on Uber's behalf for the settlement of the *McKnight* action.

///
///
///
///

69. An actual controversy exists between Uber on the one hand, and the Underwriters, on the other hand, regarding the rights and obligations under the Principia and Aspen policies insofar as Uber disputes the Underwriters' contention that the above alleged exclusions apply and further contends that the Underwriters are not entitled to reimbursement.

## PRAYER FOR RELIEF

Wherefore, Uber prays for judgment as follows:

**On the First Count for Declaratory Judgment**

1. For a declaration that the DA's letter does not constitute prior notice of a "**Claim**" under the Principia policy and, as such, Exclusion 2 does not bar coverage, in whole or in part, for the *McKnight* action and does not entitle Underwriters to reimbursement of policy benefits paid toward settlement of the *McKnight* action.

**On the Second Count for Declaratory Judgment**

2. For a declaration that the *McKnight* settlement was not based in whole or in part on any claim for restitution and/or disgorgement of profits and that Defendant Underwriters are not entitled to reimbursement of settlement money paid on Uber's behalf on said grounds.

**On the Third Count for Declaratory Judgment**

3. For a declaration that no policy or statutory exclusion applies to bar coverage for the *McKnight* action and that Defendant Underwriters are not as a matter of law entitled to reimbursement of any policy benefits paid toward settlement of the *McKnight* action.

///

4. For such other relief as the Court deems proper.

Dated: January 24, 2024

Respectfully submitted,
COLLINS | FORD, LLP

BY: s/ Michael D. Collins
Michael D. Collins
Attorneys for Plaintiffs Uber Technologies, Inc., and Raiser, LLC